FILED

2016 Jan-13  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KIM A. MASON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | Civil Action Number |
| ) | **2:13-cv-02335-AKK** |
| **UNITED PARCEL SERVICE CO.,** ) | |
| **INC., d/b/a UPS, and UNITED** ) | |
| **PARCEL SERVICE INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Kim A. Mason brings this case against the United Parcel Service, Inc.
("UPS") and the United Parcel Service Co., Inc. (collectively, "Defendants,")
alleging discrimination in violation of the Americans with Disabilities Act
("ADA"), 42 U.S.C. §§ 12101 *et seq*. Doc. 1. Defendants now move for summary
judgment. Doc. 37. For the reasons below, the court will grant Defendants' motion
and will dismiss this case with prejudice.[1]

## I.      STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary
judgment is proper "if the movant shows that there is no genuine dispute as to any

---

[1] Mason acknowledges in her response that she was never an employee of United Parcel Service
Co., Inc. *See* doc. 41 at 29. Therefore, because "[t]he ADA requires *employers* [only] to provide
reasonable accommodations for known disabilities," summary judgment is properly due to this
defendant. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998)
(emphasis added); *see also* docs. 38 at 28-29; 41 at 29.

material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient

competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL ALLEGATIONS[2]

---

[2] Mason moved to strike under Federal Rule of Civil Procedure 30(e) the deposition errata sheets for Terry White, Doreen Ingle, and Tammy Butler. Docs. 46 and 49. The motions are **DENIED** because, first, by noting the rationale behind each change (for example, "Clarification"), the errata sheets comply with Rule 30(e)'s requirement to "list the changes and the reasons given by the deponent for making them." *See McCarver v. PPG Indus., Inc.*, 243 F.R.D. 668 (N.D. Ala. 2007) (striking errata sheets because, among other reasons, the proponent had entirely failed to provide reasons for the changes). Second, UPS acknowledges in multiple filings (for example, in docs. 39-3 at 4 and 42-5 at 1-2) that three positions came available during the relevant period. As such, the court construes the errata changes as clarifications of the record and does not rely on the employees' testimony here when making its determination on the motion for summary judgment. Third, Butler's testimony regarding employees assisting others with lifting is not substantive and does not affect the court's reasoning. Fourth, regarding Ingle's errata change at doc. 39-9 at 6 related to her preliminary determination that Mason could perform the essential functions of all the positions on Mason's accommodation checklist, even though the change is substantive, it complies with the plain language of Rule 30(e). *See Cultivos Yadran S.A. v. Rodriguez*, 258 F.R.D. 530, 533 (S.D. Fla. 2009) (applying the plain language of Rule 30(e) that

Since May of 1994, Mason has worked for UPS at its Huntsville package center (the "Huntsville center"). Doc. 39-1 at 10, 18-19. UPS is a package delivery company that conducts its operations from "package centers" responsible for the pick-up and delivery of packages across a specific geographic area. Doc. 39-3 at 2-3. UPS initially hired Mason as a part-time employee and, in the early 2000s, promoted her to a full-time position as a Package Car Driver. Docs. 39-1 at 10, 18-19; 39-3 at 3. As a Package Car Driver, Mason picked up and delivered packages along assigned routes. Docs. 39-1 at 19; 39-3 at 2-3.

## A. Bargaining Unit and Non-Bargaining Unit Positions at UPS

UPS job functions are slightly different depending on the size of a specific facility. Doc. 39-8 at 12. The Huntsville center, which is one of UPS's smaller facilities, is leanly staffed and located in an older, non-automated building. Docs. 39-3 at 10; 39-8 at 10, 12. That is, "everything is pretty much manual." Doc. 39-8 at 12. The closest "automated" building is located in Memphis, Tennessee. Doc. 39-8 at 12.

### a.  The Collective Bargaining Agreement

As a Package Car Driver, Mason's employment is covered by the terms of the collective bargaining agreement ("CBA") negotiated between UPS and the

---

allows "changes in form *or substance*" and aligning with "the majority view interpreting Rule 30(e) broadly") (emphasis added). Still, the court will not rely on the portions of Ingle's deposition testimony that Mason challenges in ruling on the motion for summary judgment.

International Brotherhood of Teamsters. Docs. 39-1 at 17-19; 39-3 at 3, 11. Seniority for purposes of bidding on positions at a package center is determined by the employee's seniority date at that package center; if an employee moves to another package center, she starts at the bottom of the seniority list. Doc. 39-3 at 11. Consistent with the CBA, when a bargaining unit position becomes available, the person with the highest seniority at that package center who submitted a bid is first offered the position; if she declines it, the position is then offered to the person with the second-highest seniority, and so forth. Docs. 39-1 at 20; 39-8 at 17. With the exception of provisions relating to layoffs and specific circumstances under which a driver loses her license or is otherwise disqualified, "the CBA prohibits employees from bumping or displacing other employees from the bargaining unit jobs they occupy," doc. 39-3 at 11, although UPS has the option of negotiating with the union to accommodate a disabled employee, doc. 39-8 at 31-32.

### b.  Non-Bargaining Unit Positions—Management Assessment and Promotion Process

During the times relevant to this case, UPS required all employees who were interested in pursuing non-bargaining unit positions to complete the Management Assessment Promotion Process ("MAPP"). Docs. 39-5 at 8-9; 39-8 at 7-8. To initiate the process, the employee bore the responsibility of submitting on an annual basis a letter of intent indicating that she would like UPS to consider her for available part-time or full-time supervisory positions. Docs. 39-5 at 9; 39-8 at 8-9.

After the employee submitted the letter of intent, the second step in the MAPP process required that the employee pass an Initial Assessment, in which the employee's supervisor would score the employee's performance in a number of competency areas relevant to working in a management role. Docs. 39-5 at 9; 39-8 at 8. At the time, the minimum score to advance past the Initial Assessment was 3.5. Doc. 39-8 at 46. Successful employees must then advance through a number of other steps in the MAPP process before ultimately being placed in the promotion pool for that calendar year. Docs. 39-5 at 9.

Mason submitted a letter of intent in 2003, 2004, and (as will be discussed below) in 2012. Docs. 39-1 at 16; 39-5 at 5-6; 42-15 at 1-2. Although Mason passed her Initial Assessment in 2003 and 2004, doc. 39-8 at 36, she has never held a non-bargaining unit position at UPS, doc. 39-1 at 20.

## B. Mason's Injury

On March 22, 2011, Mason fell from the rear of her package truck, breaking both bones of her forearm near her left wrist. Docs. 39-1 at 21-22; 32-2 at 4; 39-5 at 16; 42-2 at 2. As a result of the injury, Mason underwent surgery and was placed on a medical leave of absence. Doc. 39-1 at 21-22. Dr. James Martens, Mason's physician, determined in October 2011 that Mason had reached maximum medical improvement ("MMI"), albeit with certain restrictions, including a permanent

lifting restriction of 25 pounds that left Mason unable to do her job. Doc. 39-1 at 10, 22. To date, none of these restrictions have changed. *Id.* at 22.

### C. ADA Accommodation Process

#### a. February 10, 2012 Checklist Meeting

Upon learning that Mason was no longer able to perform the duties of a Package Car Driver, UPS suggested in early 2012 that Mason engage in an accommodation process to determine her eligibility for a job-related accommodation. Docs. 39-2 at 1; 39-2 at 1. After Mason contacted UPS, on February 10, 2012, Doreen Ingle, Lois Forsmo, and Tammy Butler[3] met with Mason for a so-called "checklist meeting" regarding Mason's medical restrictions and potential reasonable accommodations that would allow her to perform the essential functions of a position at UPS. Docs. 39-1 at 23-24; 39-2 at 2; 39-5 at 2-3. In preparation for this meeting, Dr. Martens had completed a document describing Mason's physical limitations, which stated that Mason was unable to: "(1) lift, lower, push, pull, leverage, and manipulate equipment . . . or packages weighing up to 70 pounds; (2) assist in moving packages weighing up to 150 pounds; (3) lift packages to heights above the shoulder[; or (4)] lower [packages] to foot level."

---

[3] At the time, Ingle was the Area Human Resources Manager for UPS's Mid-South District, doc. 39-5 at 2; Forsmo was the Mid-South District Occupational Health Nurse/District Occupational Health Supervisor for the Mid-South District, doc. 39-4 at 2; and Butler was a Human Resources Specialist in Decatur, Hartselle, and Huntsville, doc. 39-6 at 2. Mason does not specifically recall Forsmo attending the meeting via teleconference. Doc. 39-1 at 24.

Docs. 39-1 at 24; 39-2 at 3-6; 39-5 at 16. Moreover, Dr. Martens indicated that Mason had a permanent 25-pound lifting restriction and that she could only lift 10 pounds occasionally. Docs. 39-1 at 24; 39-2 at 4-5; 39-5 at 16-17.

After Mason and the UPS team reviewed the information submitted by Dr. Martens and discussed the accommodation form, Mason completed the employee portion ("Part A") of the accommodation checklist form, which requested that Mason describe how her medical condition affected her ability to do her job, outline the ways UPS could accommodate her condition, and suggest other jobs she felt she could perform with or without reasonable accommodation. Docs. 39-1 at 25-26; 39-5 at 3, 23-24. On this form, Mason described the same lifting and weight restrictions as those delineated by Dr. Martens (except that she left out his restriction on lowering packages to foot level), *see* docs. 39-1 at 24, 26-7; 39-2 at 3-6, 8; 39-5 at 23-24; failed to describe any reasonable accommodations that she believed would help her do her job; and, instead, requested jobs that did not require her "to lift 'heavy' packages," specifically non-bargaining unit positions in human resources and other management-type positions that did not require lifting, doc. 39-2 at 8. When asked to identify other jobs that she believed she could perform with or without reasonable accommodation, Mason listed, "[a]ir driver, customer counter, clerk, office, safety, preload, spa, decap, dispatch, local sort smalls, overgoods, office clerk, porter, car wash, misloads, [and] hazmat." Docs. 39-2 at 8;

39-5 at 23. This list included a mix of bargaining unit and non-bargaining unit positions, as well as a mix of tasks that fall within different positions.[4] Docs. 39-2 at 27-28; 39-3 at 4-9; 39-5 at 4. Significantly, Mason instructed Ingle and others to limit their search for positions to the general geographic area of Huntsville. Docs. 39-1 at 31; 39-9 at 18.

After the checklist meeting, Ingle reviewed the essential functions of each position Mason had identified and populated Part B of the accommodation

---

[4] Mason listed the following bargaining unit positions: Air Driver, Customer Counter Clerk, Preloader, Clerk, Porter, and Car Washer. Docs. 39-3 at 4-8; 39-5 at 43. The job descriptions for these positions require the employee to lift as many as 70 pounds unassisted. Doc. 39-3 at 16, 18, 20, 22, 30, 33. Air Drivers, Customer Counter Clerks, Center Clerks, and Preloaders must also assist with the moving of packages weighing up to 150 pounds, lift packages to heights above the shoulder, and lower packages to floor level. *Id.* at 16, 18, 20, 22. Porters constantly lift up to 10 pounds above their shoulder and lower between 51 and 70 pounds below their waist, while Car Washers must constantly lower between 51 and 70 pounds below the waist. *Id.* at 30, 33.

Mason also listed certain tasks performed by employees in bargaining unit positions: "local sort smalls," "spa," misloads, overgoods, and hazmat, docs. 39-5 at 4-5, which are not stand-alone positions in a small facility such as Huntsville, docs. 39-3 at 8; 39-5 at 4. Employees in the Loader/Unloader job classification complete the small sort, spa, misloads, and hazardous materials tasks. Docs. 39-3 at 8, 36; 39-5 at 4-5; 39-8 at 10. Job descriptions for the Loader/Unloader positions require employees to lift up to 70 pounds unassisted, assist in the moving of packages weighing up to 150 pounds, lift up to 50 pounds over their shoulders, and lower as many as 70 pounds below their waist. Doc. 39-3 at 25-28. One of the tasks assigned to Loaders/Unloaders performing the small sort tasks is to sort and bag smaller packages that fit within a certain size classification into specified containers or bags for delivery elsewhere. Doc. 39-3 at 8. The parties dispute how much these containers typically weigh. *See* docs. 39-3 at 8 (UPS stating that the packages "typically weigh more than 25 pounds"); 42-9 at 3 (Martha Pender stating that the packages are "no heavier than six to eight pounds, [and are] supposed to be kept around fifteen to twenty-five pound[s] maximum"). "Spa" tasks require employees to label packages as they move through the package center; "misloads" tasks involve the correction of package misloads; and "hazardous materials" tasks entail the handling of hazardous materials. Doc. 39-5 at 5. Finally, a Clerk corrects "overgoods," a term used to describe displaced package contents. Docs. 39-1 at 28; 39-5 at 5.

Finally, Mason listed "office clerk," "dispatch," and "safety," which are tasks performed by non-bargaining unit employees and are not stand-alone positions. *See* doc. 29-5 at 5.

checklist, which inquired into the employee's eligibility for the positions listed as well as the reasonableness of the accommodations requested. Docs. 39-2 at 10-11; 39-5 at 6; 39-9 at 11. This form required Ingle to examine the proposed accommodations Mason suggested and to determine whether the positions were available; whether Mason possessed the requisite education, skills, and experience ("ESE") for the positions; whether Mason "preliminarily appear[ed]" capable of performing the essential job functions ("EJF") of the positions; and whether the transfer or reassignment would constitute a conflict with any portion of the CBA. Doc. 39-2 at 10-11. Regarding the Air Driver, Customer Clerk, Preload, Small Sorts, Porter, Car Wash, Office, and Clerk positions and tasks, Ingle noted that none were currently available or expected to be available within a reasonable period of time, that Mason had the qualifying ESE for them, and that she preliminarily appeared to have the EJF for the positions with or without accommodations.[5] Docs. 39-2 at 10; 42-4 at 3. Ingle did not have access to Mason's medical records when she filled out this form, so she was not able to review them when making this preliminary determination. Doc. 39-2 at 20. On the form, Ingle underlined the word "with," seemingly to indicate that Mason would

---

[5] Although Mason asserts that Ingle "identified numerous positions [Mason] could perform with reasonable accommodations," doc. 42-4 at 2 (emphasis in original), the checklist form belies Mason's contention by making it clear that Ingle's determination was preliminary, doc. 39-2 at 10 (asking if "the employee *preliminarily* appear[ed] capable of performing the essential job functions" Mason had listed) (emphasis added). Mason did not see Part B of this form until she had filed her union grievance in September of 2012. Doc. 39-1 at 25.

need accommodation. *Id.* at 10. In any event, Ingle's determination was not final, as Ingle apparently did not have the authority to solely determine whether a reasonable accommodation existed. Docs. 39-2 at 10; 39-8 at 14, 29; 39-9 at 8, 16.

After Ingle completed Part B of the accommodation checklist, she forwarded it to Forsmo, a representative of UPS's Occupational Health department. Doc. 39-4 at 5; 39-5 at 6. After Occupational Health reviewed Mason's accommodation checklist, UPS determined that, at the time, it had no positions available for which Mason qualified, with or without accommodation. Doc. 39-4 at 5.

### b. Search for Reasonable Accommodation

Despite the initial determination, the accommodation process continued. At UPS, an accommodation request for bargaining unit employees remains open for three years from the date of injury; after that time period has passed, the CBA states that the employee's seniority is considered "broken," and the employee may be terminated.[6] Doc. 39-8 at 43. Additionally, bargaining unit employees are entitled to a six-month period from the time of their initial checklist meeting during which UPS will actively look for available positions to accommodate disabled employees. Docs. 39-2 at 23; 39-5 at 7-8; 39-8 at 42.

---

[6] Although UPS could have terminated Mason in March of 2014, three years after her injury, Mason remains an inactive UPS employee. Doc. 39-8 at 43.

Consistent with UPS policy, on April 3, 2012, Ingle sent Mason a letter notifying her that UPS was not aware of any available position for which she was qualified and capable of performing the essential job functions, with or without reasonable accommodation. Docs. 39-2 at 2-3; 39-5 at 7, 39. In this letter, Ingle also informed Mason that UPS would continue to look for available positions in the general Huntsville area for up to six months. Docs. 39-2 at 23; 39-5 at 7, 39. Additionally, Ingle requested that Mason contact Ingle if her physical condition changed or if Mason became aware of a position that Mason felt she could perform. Docs. 39-2 at 23; 39-5 at 7, 39. The letter also asked Mason to call Ingle if she had any questions. Docs. 39-2 at 23; 39-5 at 7, 39.

Throughout the following six months, Mason and Ingle communicated "regularly" regarding job openings and the availability of positions in Huntsville for which Mason could qualify.[7] Docs. 39-1 at 32, 35-36 (indicating that Mason "had many conversations with [Ingle and UPS]" and that they had spoken on "[n]umerous[] occasions"); 39-5 at 8; 42-2 at 5. Additionally, at least twice a month Ingle contacted Paul Witt, the Huntsville center's Business Manager, and Butler to investigate whether any positions for Mason had become available. Docs. 39-5 at 7; 39-9 at 10. During that period of time, UPS determined that no eligible positions came available, and Ingle told Mason as much when they spoke. Docs.

_____

[7] Mason surreptitiously recorded "[s]everal—but not all—of these telephone calls. Doc. 39-1 at 32. These recordings are not part of the summary judgment record.

39-5 at 7-8; 42-2 at 5. As Mason herself observed, "Any job at UPS is demanding," doc. 39-1 at 19, and accommodating Mason was all the more challenging because "UPS does not have permanent light duty work assignments," doc. 39-3 at 10.

At least once, Ingle inquired as to whether Mason had applied for the MAPP process so UPS could consider her for supervisory jobs. Docs. 39-1 at 30-31, 33; 39-5 at 10; 42-2 at 4. In response, Mason informed Ingle and others that she had begun the MAPP process a number of years previously and that her letter of intent had expired. Doc. 39-1 at 30-31. At some point in the summer of 2012, Mason inquired with Ingle about the Clerk and Customer Counter Clerk positions that Mason believed had come available. Doc. 39-5 at 8. Ingle informed Mason that UPS had determined that she was not qualified for these positions because they required lifting well in excess of her 25-pound weight limitation. Doc. 39-5 at 8.

On September 13, 2012, Mason wrote Ingle a letter inquiring about the status of her accommodation process. Docs. 39-1 at 34-35; 39-2 at 25; 39-5 at 8, 41. In this letter, Mason also requested that Ingle consider her for two positions that Mason described as "Package Center Clerks." Docs. 39-2 at 25; 39-5 at 41. However, the available positions at that time were actually Part-Time Package Center Supervisor positions—positions that required successful completion of the MAPP process. Docs. 39-5 at 8; 39-8 at 42. Perhaps because of this, Mason also

submitted a letter of intent to initiate her participation in the MAPP process. Docs. 39-2 at 24; 39-5 at 8, 43.

In light of Mason's letter of intent, docs. 39-5 at 8; 39-9 at 9, 21, in the fall of 2012, Jeff Hill, Mason's supervisor of several years, completed Mason's Initial Assessment as part of the MAPP process and awarded Mason a score of 2.215, doc. 39-7 at 4-5. This score fell short of the 3.5 out of 5 required to advance to the next step in the MAPP process. Docs. 39-1 at 38; 39-7 at 4-5; 42-17 at 1-2. Therefore, because Mason did not successfully advance through the MAPP process, UPS did not consider her for any management positions that became available in 2012. Docs. 39-5 at 7-8, 10-11; 39-6 at 3-4.

### c. Positions Available During the Relevant Period

In the period between February 2012 and April 2013, both bargaining unit and non-bargaining unit positions became available at the Huntsville center. Docs. 39-5 at 8-9; 42-5 at 1-2.

### i. *Bargaining Unit Positions*

The only bargaining unit positions on Mason's accommodation checklist that became available were: Preloader, Clerk, and Air Driver. Doc. 42-5 at 1-2. UPS did not contact Mason about these openings. Doc. 42-4 at 5.

### 1. Preloader

Preloaders are responsible for moving packages through the package centers and for loading these packages onto package cars at the beginning of each day. Doc. 39-3 at 6. The job description requires that Preloaders lift, lower, and carry packages at a rate of 200 to 400 per hour; additionally, employees must assist with moving packages weighing up to 150 pounds. *Id.* at 23. Preloaders occasionally (i.e., between "1%-33%" of time) lift items weighing up to 70 pounds, and they constantly lift items between 1 and 20 pounds, frequently lift items between 21 and 50 pounds, and occasionally lift items between 51 and 70 pounds above the shoulder. *Id.*

### 2. Clerk

Customer Counter Clerks staff the counter and are responsible for receiving and processing packages from customers. Doc. 39-3 at 5. At times, only one Customer Counter Clerk works at a given time in the Huntsville center, doc. 39-3 at 5, although employees filling other positions may be "regularly in the area," doc. 42-9 at 2-3. Center Clerks handle damaged packages, rewrap and repackage damaged packages, and correct labeling errors. Doc. 39-3 at 5. The job description for both positions requires the employee to: (1) lift, lower, push, pull, leverage, and manipulate equipment or packages weighing up to 70 pounds; (2) assist in moving

packages weighing up to 150 pounds; (3) lift packages to heights above the shoulder; and (4) lower packages to foot level. *Id.* at 18, 20. However, Mason and Martha Pender, one of the employees who received the Clerk position in early July 2012, doc. 42-5 at 2, disagree with the lifting component. Specifically, Mason contends that she has witnessed employees receiving help lifting packages that are "heavy." Doc. 42-2 at 3. Indeed, Pender notes that, when she has "heavy packages that [she] needs to move," she can move these packages with the assistance of "various people" during her shift, that she "can also push heavier packages out of the way and leave them for local sort and they will come in and move them for [her]," and that she directs customers "with heavy packages [to] place the[m] directly on the counter or rollers for [her]." Doc. 42-9 at 1-3.

### 3. Air Driver

Air Drivers pick up and deliver next-day air packages. Doc. 39-3 at 5. The job description indicates that the employee: (1) lift, lower, push, pull, leverage, and manipulate equipment and packages weighing up to 70 pounds; (2) assist in moving packages weighing up to 150 pounds; (3) lift packages to heights above the shoulder; and (4) lower packages to foot level. *Id.* at 16.

### ii.  *Non-Bargaining Unit Positions*

In late summer 2012, two Part-Time Package Center Supervisor positions became available at the Huntsville center. Doc. 39-6 at 3. Because no current UPS employees, including Mason, had successfully completed the MAPP process, UPS looked to—and eventually hired—two candidates from outside the company. *Id.* at 3, 5. In fact, the Huntsville center had already received authorization to hire outside candidates prior to Mason submitting her September 2012 letter of intent to initiate the MAPP process. Docs. 39-1 at 34-35; 39-2 at 24; 39-5 at 8, 43.

## III.   ANALYSIS

The only remaining claim at issue in this case is for discrimination in violation of the ADA, 42 U.S.C. §§ 12101 *et seq.*[8] Mason claims that UPS violated the ADA by failing to provide her a position she could perform with reasonable

---

[8] Mason originally pursued claims for: (1) discrimination on the basis of disability, race, gender, sex, and seniority (Count I); (2) intentional infliction of emotional distress (Count III); and (3) negligent infliction of emotional distress (Count IV). This court previously dismissed with prejudice Mason's claim for negligent infliction of emotional distress, as such a claim is not cognizable under Alabama law. Doc. 21. Also, pursuant to a previous joint stipulation of dismissal, this court dismissed without prejudice Mason's claims of discrimination on the basis of age and gender. Doc. 25. Because Mason did not advance any argument or supporting authority in support of her sex and seniority claims (Count I) or in response to UPS's motion for summary judgment as to her intentional infliction of emotional distress claim (Count III), the court will grant summary judgment as to these claims. *See, e.g.*, *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n.2 (11th Cir. 2009) (finding that the plaintiff waived claims he did not address in his response to the defendant's motion for summary judgment) (citing *Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001)); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted).

accommodation. *See* docs. 1 at 5; 41 at 5. For the reasons discussed more fully below, summary judgment is due to be granted as to this claim.

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. In general, "[t]he ADA requires employers to provide reasonable accommodations for known disabilities unless that accommodation would result in undue hardship for the employer." *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) (citation omitted); *see also Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001). The employee must also show that "such an accommodation is reasonable." *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997).

To establish a prima facie case for failure to accommodate, Mason must show that (1) she is disabled; (2) she is a "qualified individual;" and (3) she was subjected to unlawful discrimination because of her disability. *See, e.g.*, *Lucas*, 257 F.3d at 1255. Mason has failed to make such a showing.

## A. Mason is Disabled

UPS concedes that Mason's impairments constitute a disability under the ADA. *See* docs. 38 at 18; 41 at 15; *see also Stewart v. Happy Herman's Cheshire*

*Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997); 42 U.S.C. § 12102. Therefore, Mason has satisfied the first prong of the prima facie case.

### B.  Mason is Not a "Qualified Individual"

To be a "qualified individual," a person with a disability "must satisfy 'the requisite skill, experience, education and other job-related requirements of the employment position,' and 'with or without reasonable accommodation,' the individual must be able to perform the 'essential functions of the position.'" *LaChance*, 146 F.3d at 835 (citing § 12112(a)); *Earl v. Mervyns, Inc.*, 207 F.3d 1361 (11th Cir. 2000) ("An individual is 'qualified' if she, with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds.") (citations omitted). "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables an employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1256; *see LaChance*, 146 F.3d at 835 (citation omitted). Indeed, "[t]he ADA defines 'essential functions' to be the fundamental job duties of the employment position, as differentiated from 'marginal' functions." *LaChance*, 146 F.3d at 835. The plaintiff bears "the burden of identifying an accommodation that would allow a qualified individual to perform the job[, and she also bears] the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Stewart*, 117 F.3d at 1286.

### a.  Essential Functions of the Available Bargaining Unit Positions[9]

Mason claims that she is a "qualified individual" because she possesses the requisite skill and education to perform with reasonable accommodations "several" of the positions she identified in her accommodation checklist. *See* doc. 41 at 18. UPS disagrees and counters that the positions that came available during the accommodation period—Preloader, Clerk, and Air Driver—require physical capabilities that fall outside of Mason's restrictions.[10] Doc. 38 at 18-21. Indeed, Mason's medical restrictions only allow her to lift up to 25 pounds and to only occasionally lift 10 pounds, and they prohibit her from lifting packages above the shoulder or lowering them to foot level. It seems Mason agrees that she cannot

---

[9] To the extent that Mason argues that UPS should have awarded her a non-bargaining unit position, it is undisputed that such positions only go to bargaining unit employees who have successfully completed the MAPP process. Mason had not done so when UPS filled the only two positions that became open during the relevant period. Moreover, when Mason submitted a letter of intent to enter into the MAPP process in September of 2012, she did not pass her Initial Assessment, did not challenge her unsatisfactory score on her Initial Assessment, and has not applied for a non-bargaining unit position since. Because she has not satisfied the requirements for a non-bargaining unit position, UPS had no obligation to place her in such a position. *See Lucas*, 257 F.3d at 1257 ("The ADA does not mandate that employers promote disabled employees in order to accommodate them.") (citation omitted).

[10] Although Mason included Car Washer and Porter on her accommodation checklist, these positions did not become available during the time period at issue. *See* doc. 42-5 at 1-2. Therefore, Mason cannot establish that UPS discriminated against her as to these positions. *Willis*, 108 F.3d at 284 ("Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified.") (citations omitted). Mason similarly cannot establish that the tasks she identified in her accommodation checklist—for example, small sort—are the basis for her discrimination claim because UPS did not make them a stand-alone position for her. *Cf. Rabb v. School Bd. of Orange Cnty, Fla.*, 590 F. App'x 849, 851 (11th Cir. 2014) (holding that an employer had not discriminated against the plaintiff by failing to create a part-time position for her, because "there is no duty to create a part-time position where the employer has eliminated part-time positions") (citations omitted).

perform the Preloader and Air Driver positions because her response focuses only on the Clerk position, for which she argues that she is qualified because the essential functions do not actually include lifting and lowering activities outside of her physical capabilities.[11] *See* doc. 41 at 20-23. In particular, Mason argues that the Clerk position rarely spends time lifting packages outside of her limitations, that the consequences of not requiring her to lift packages would be minimal, and that she can do the job because Clerks receive assistance lifting "heavy" packages. *See id.* However, Mason's arguments miss the mark.

To be deemed a "qualified individual" for purposes of the ADA, Mason must establish that the essential job functions of the Clerk position fall within her medical limitations. *See Stewart*, 117 F.3d at 1278. Indeed, "[i]f the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Holly v. Clairson Indus.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1229 (11th Cir. 2005)). When determining which aspects of a position are essential, "'consideration shall be

---

[11] Mason does address the Preloader position in one sentence in her brief: "The 'preloader' functions only 'occasionally' fall outside Mason's restrictions." *See* doc. 41 at 21. While Mason is correct that the Preloader job description indicates that Mason would "[o]ccasional[ly]" lift up to 70 pounds, the job description defines the term "[o]ccasional" as up to 33% of the time, and Mason has presented no evidence indicating that the Preloader does not, in fact, spend a third of her time lifting weights above Mason's medical restrictions. Moreover, Mason has presented no evidence to contradict that the Preloaders are required to assist in the moving of packages weighing up to 150 pounds, or that a reasonable accommodation exists that would enable Mason to move between 200 and 400 packages an hour as required by the job description.

given to the employer's judgment . . . and if an employer has prepared a written description . . . for the job, this description shall be considered evidence of the essential functions of the job.'" *Earl*, 207 F.3d at 1365 (quoting § 12111(8)). While the job descriptions are given "substantial weight in the [court's] calculus," other factors to consider when examining the essential functions of a position include the amount of time spent on the job performing the function, the consequences of not requiring an employee to perform the function, and the work experience of past and current employees in the job. *See D'Angelo*, 422 F.3d at 1230, 1233 (quoting *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000)). Significantly, an employer "'[is] not require[d] . . . to eliminate an essential function of the . . . job'" in order to accommodate an employee. *Holly*, 492 F.3d at 1256 (quoting *D'Angelo*, 422 F.3d at 1229).

Mason argues that consideration of factors beyond UPS's job descriptions for the Clerk position establishes that lifting and lowering outside of Mason's medical parameters are not essential job functions of those positions. To overcome the "substantial weight" afforded to the job descriptions,[12] *see D'Angelo*, 422 F.3d at 1233, Mason argues first that the amount of time the Clerk actually spends lifting outside of her physical restrictions is "infrequent," doc. 41 at 20. She notes

---

[12] Relevant here, the position requires that the employee: lift, lower, push, pull, leverage, and manipulate equipment and/or packages weighing up to 70 pounds; assist in moving packages weighing up to 150 pounds; and lift packages to heights above the shoulder and lower to foot level, *see* doc. 39-3 at 18, 20,—all of which are tasks Mason cannot do medically.

that both she and Pender (the employee who received the recent Clerk position) aver that the Clerk job does not "typically" require lifting "heavy" items and, when needed, someone else can move these "heavy" packages. Docs. 41 at 20; 42-2 at 3; 42-9 at 2-3. This contention is unavailing for several reasons. First, Mason does not advance any evidence addressing the job descriptions' requirement that Clerks must lift items above the shoulder and lower them to the floor—actions that Dr. Martens has prohibited Mason from doing. *See* doc. 39-2 at 4 (stating that Mason was unable to "lift packages to heights above the shoulder" or "lower [packages] to foot level"). After all, even if other employees move "heavy" packages for Clerks, Mason is still medically unable to lift packages above the shoulder and lower them to the ground, tasks that she does not dispute are essential for non-"heavy" packages. Second, Mason fails to define what constitutes "heavy"—a significant factor because the job descriptions in fact allow for assistance in lifting packages weighing more than 70 pounds. *See* doc. 39-3 at 18, 20. Mason, however, has a maximum lifting restriction of 25 pounds and simply does not address whether UPS allows other employees to lift packages weighing 25 to 70 pounds for coworkers. Even giving Mason the benefit of all reasonable inferences, the court does not construe the term "heavy" to encompass all packages that weigh more than Mason's permanent maximum lifting limit of 25 pounds and "occasional[]" limit of 10 pounds. Indeed, it seems unreasonable to infer from Pender's

declaration that, in saying she receives help with "heavy" packages, Pender, who seemingly has no physical restrictions, meant that she typically receives help for packages weighing more than 10 pounds or, even, more than 25 pounds. Ultimately, because this court "[is] not obliged . . . to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative," *see Stewart*, 117 F.3d at 1285 (relying on *Anderson*, 477 U.S. at 249), the court does not find that Mason's and Pender's averments weigh towards finding that the essential function of the Clerk position excludes lifting more than 25 pounds at all or 10 pounds more than occasionally.

The court is similarly unpersuaded by Mason's contention that the consequences of not requiring her to perform the lifting functions of a Clerk are minimal or that the 70-pound lifting requirement is not an essential function of Clerk position. *See* doc. 41 at 21. These contentions are based on Mason's claims that "others are regularly in the area to assist," *see id.*, and on Pender's affidavit that she moves "heavy" packages by doing a team lift, she pushes heavier packages out of the way and leaves them for other employees to move at a later time, she gets assistance during her shift from other employees and customers, she uses hand trucks for assistance with heavy packages, and she has customers place their heavy packages directly onto the rollers. *See* doc. 42-9 at 2-3. However, Mason's argument here falls prey to the same problems as those described above—i.e., they

do not address Mason's specific restrictions. In particular, because Dr. Martens has unequivocally stated that Mason cannot "assist in moving packages weighing up to 150 pounds," doc. 39-2 at 4, that Pender "team lifts" with others or pushes heavier packages out of the way does not create a material issue of fact because these are actions that Mason is precluded medically from doing, *see id.* Next, the job of a Clerk in Pender's position is to receive and process packages that customers bring to the Huntsville center. Therefore, it seems unreasonable to infer from Pender's testimony that Pender avoids service failures and still seeks the assistance of others with every package weighing more than 25 pounds. Finally, Mason overlooks that she can only *occasionally* lift 10 pounds or more without risking further injury or pain in her wrist and shoulder. Although Mason is entitled to reasonable inferences, the court finds that it is unreasonable to infer that Pender's testimony indicates that Pender, a person with no lifting restrictions, can leave most packages weighing more than 10 pounds and all packages weighing more than 25 pounds for coworkers to address without disrupting coworkers' ability to complete their tasks—especially given how leanly staffed the Huntsville center is—or without falling behind on her own performance responsibilities. Therefore, Pender's testimony as to the consequences of asking for assistance is not "significantly probative" here, and this factor does not sufficiently rebut the substantial deference

owed to UPS's 70-pound lifting requirement for the Clerk position. *See Anderson*, 477 U.S. at 249.

In the final analysis, Mason has failed to show that the essential function of the Clerk includes only lifting 10-pound packages occasionally and never lifting more than 25-pound packages. Requiring UPS to relieve Mason of the duty to ever lift packages weighing more than 25-pounds and to only occasionally lift packages weighing 10-pounds would be tantamount to "transform[ing] the [Clerk] position into another one by eliminating functions that are essential to the nature of the job as it exists." *See Lucas*, 257 F.3d at 1260. This would be improper under the ADA, which does not obligate employers "to accommodate [employees] in any manner in which [the employees] desire[]" or to excuse employees from performing essential functions. *See Ivey v. First Quality Retail Svc.*, 490 F. App'x 281, 285 (11th Cir. 2012). Additionally, accommodating Mason by, for instance, scheduling a second Clerk only when Mason is working is similarly unreasonable because "UPS has no duty to have someone else do [Mason's] job to accommodate her disability." *See Guerra v. United Parcel Service, Inc.*, No. 00-40435, 2001 WL 274296, at *2 (5th Cir. 2001). Because Mason bears "the burden of identifying [a reasonable] accommodation that would allow a qualified individual to perform the job," *Stewart*, 117 F.3d at 1286, and "[b]ecause [Mason] has not proposed a reasonable accommodation that would allow her to perform the essential functions of [the

Clerk position], she has failed to show that she was a qualified individual" under the ADA. *See Ivey*, 490 F. App'x at 286.

### b. Ingle's Preliminary Determination Regarding Mason's Accommodation

In addition to challenging whether the lifting requirement of the Clerk position is essential, Mason also argues that UPS deemed her a "qualified individual" for the jobs that she listed in her accommodation checklist. This contention is based on Ingle answering "Yes" on Part B of the accommodation checklist when populating the portion of the form inquiring as to whether Mason had the EJF to perform these jobs with accommodation. *See* doc. 41 at 18-20. Based on this preliminary indication that Mason could perform the positions with reasonable accommodation, and because "Ingle never adjusted, or otherwise amended, her determination" or "told [Mason] that the initial determination was altered,"[13] Mason contends that a material factual dispute exists as to whether she is a qualified individual for the three available bargaining unit positions on her accommodation checklist. *See* doc. 39-2 at 10; 41 at 18-19. This contention is unavailing because the accommodation checklist form describes Ingle's determination as "preliminary." *See* doc. 39-2 at 10 (asking if "the employee

---

[13] Ingle's purported failure to tell Mason that she had "altered" the initial determination is a quintessential red herring. Mason was not aware of Part B (or its contents) until she filed her grievance more than seven months after her checklist meeting. Doc. 39-1 at 25. As such, Mason can hardly stand upon the fact that Ingle never notified her that UPS did not agree with Ingle's preliminary determination as grounds for this particular discrimination claim.

*preliminarily* appear[ed] capable of performing the essential job functions" Mason had listed) (emphasis added). Moreover, Mason has not shown that Ingle indicated to Mason that Ingle had the sole authority to make this determination. In fact, based on the record before this court, Ingle did not have the authority to make an accommodation determination on her own. *See* docs. 39-5 at 6; 39-8 at 14, 29; 39-9 at 8, 16; 42-4 at 3. Rather, the decision also involved UPS's Occupational Health department—a fact Mason totally overlooks.[14] In that respect, that Ingle never "adjusted, or otherwise amended" her preliminary determination or told Mason that she had done so is not determinative absent evidence that Ingle had an obligation to update this form or that Ingle even kept it in her possession after sending it to Forsmo. Additionally, the record is replete with evidence that Ingle informed Mason multiple times that UPS had no positions available for which Mason qualified—which further belies Mason's contention that UPS, through Ingle, had determined that she was a qualified individual.

Ultimately, to find an issue of fact exists as to whether UPS deemed Mason a qualified individual, the court would have to ignore the record—specifically, that the form Mason relies on stated that the determination was "preliminary," that the form was then sent to Occupational Health, and that subsequently UPS informed

---

[14] According to Forsmo (the Occupational Health Supervisor for the district): "After the checklist meeting, I received the completed checklist form. Thereafter, it was determined that, based on Ms. Mason's restrictions as reported by Ms. Mason and her doctor, there were no positions available . . . ." Doc. 39-4 at 5.

Mason that it had no position for which she qualified, with or without accommodation. *See* docs. 39-1 at 31-32; 39-2 at 10, 23; 39-4 at 5. Thereafter, UPS continued to evaluate its assessment when it had vacancies in the positions Mason identified. *See* docs. 39-5 at 7-8; 39-9 at 10. Based on this record and on the job descriptions, the court finds that Ingle's preliminary statement that Mason appeared to be able to perform the essential job functions of the positions is "merely colorable [and] not significantly probative." *See Stewart*, 117 F.3d at 1285 (relying on *Anderson*, 477 U.S. at 249) (finding that courts "are not obliged . . . to deny summary judgment for the moving party when the evidence favoring the nonmoving party is merely colorable or is not significantly probative").

For the reasons outlined above, the court finds that Mason is not a "qualified individual" for purposes of the ADA.[15] In light of this finding, Mason cannot show that UPS discriminated against her. Therefore, the court need not address the final prong of the prima facie case.[16] *See Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446,

---

[15] Insofar as Mason argues that UPS has failed to show that accommodating her would impose an undue hardship, doc. 41 at 23-25, she overlooks that it is only "[o]nce the plaintiff has met her burden of proving that reasonable accommodations exist[ that] the defendant-employer [is then obligated to] present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Rabb*, 590 F. App'x at 850.

[16] To the extent that Mason complains that the failure to inform her of positions coming available that she had listed on her accommodation checklist is evidence of discrimination, doc. 41 at 26-28, Mason has presented no case law standing for the proposition that under the ADA, an employer must inform an employee of every position that comes available that she has expressed interest in, regardless of whether she is qualified for the position. Even still, Mason is not able to advance a showing in the first place that she was a qualified individual for the Preloader, Clerk,

448 (11th Cir. 1996) (holding that the plaintiff must present probative evidence that a reasonable accommodation was available because "[a] contrary holding would mean that an employee has an ADA cause even though there was no possible way for the employer to accommodate the employee's disability").

## IV.   CONCLUSION

In sum, the Defendants' motion for summary judgment, doc. 37, is due to be granted as to the discrimination claim under the ADA and on the basis of sex and seniority (Count I) as well as the intentional infliction of emotional distress (Count III).

**DONE** the 13th day of January, 2016.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

or Air Driver positions because she was either unable or did not attempt to rebut the UPS job descriptions for the job, so any error on UPS's part was harmless. Finally, to the extent that Mason claims UPS did not engage her in an "interactive process" during the six-month accommodation period, doc. 41 at 25-26, this contention also fails. As Mason testified, Ingle and Mason communicated "regularly" regarding job openings and the availability of positions for which Mason qualified with or without reasonable accommodation during this time period. *See* docs. 39-1 at 32, 35-36; 39-5 at 8; 42-2 at 5.  Additionally, even if UPS had failed to engage in an interactive process with Mason, "that failure neither amounted to a violation of the ADA nor relieved [the plaintiff] of his burden of demonstrating the availability of a reasonable accommodation." *See McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 682 (11th Cir. 2010).